1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
JERRY DAVIDSON, individually   .    Civil Action No. 1:20cv1263
and on behalf of all others    .
similarly situated,            .
                               .
              Plaintiff,       .
                               .
     vs.                       .    Alexandria, Virginia
                               .    January 8, 2021
UNITED AUTO CREDIT             .    10:00 a.m.
CORPORATION, a California      .
corporation,                   .
                               .
              Defendant.       .
                               .
. . . . . . . . . . .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE
(Via Teleconference)

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:              KRISTI C. KELLY, ESQ.
                               Kelly Guzzo, PLC
                               3925 Chain Bridge Road, Suite 202
                               Fairfax, VA 22030
                                 and
                               LEONARD A. BENNETT, ESQ.
                               Consumer Litigation
                               Associates, P.C.
                               763 J. Clyde Morris Boulevard
                               Suite 1-A
                               Newport News, VA 23601
                                 and
                               JANET R. VARNELL, ESQ.
                               Varnell and Warwick, P.A.
                               1101 E. Cumberland Avenue
                               Suite 201H, #105
                               Tampa, FL 33602

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 1 - 37)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

                                                                                    2

APPEARANCES:  (Cont'd.)

FOR THE PLAINTIFF:              TINA WOLFSON, ESQ.
                               CHRISTOPHER E. STINER, ESQ.
                               Ahdoot & Wolfson, P.C.
                               10728 Lindbrook Drive
                               Los Angeles, CA 90024


FOR THE DEFENDANT:             RAYMOND Y. KIM, ESQ.
                               Holland & Knight LLP
                               400 South Hope Street
                               8th Floor
                               Los Angeles, CA 90071
                                 and
                               TRAVIS A. SABALEWSKI, ESQ.
                               Holland & Knight LLP
                               1650 Tysons Boulevard, Suite 1700
                               Tysons, VA 22102


OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
                               U.S. District Court, Third Floor
                               401 Courthouse Square
                               Alexandria, VA 22314
                               (703)299-8595

3

1              P R O C E E D I N G S

2              THE COURT:  Good morning, counsel.  This is the

3    matter of Jerry Davidson, individually and on behalf of all

4    others similarly situated, versus United Auto Credit

5    Corporation, a California corporation, Civil Action 20cv1263.

6              Do we have counsel here for the plaintiff?

7              MS. VARNELL:  Yes, Your Honor.  This is Janet

8    Varnell, and on the line with me are a number of my cocounsel.

9              THE COURT:  All right, Ms. -- I'm sorry, Ms. Varnell,

10   are you going to be the main spokesperson for the plaintiff?

11             MS. VARNELL:  I would like to.

12             THE COURT:  All right, that's fine.  Did you want to

13   introduce the other participants?

14             MS. VARNELL:  I guess I'd like them to each introduce

15   themselves, please.

16             THE COURT:  All right, go ahead.

17             MS. KELLY:  Good morning, Judge.  This is Kristi

18   Kelly with Kelly Guzzo on behalf of the plaintiff as well.

19             THE COURT:  Good morning.

20             MR. BENNETT:  And, Judge, this is Leonard Bennett,

21   also on behalf of the plaintiff, calling from down here in

22   Newport News.

23             THE COURT:  All right, Mr. Bennett.

24             MR. BENNETT:  Good morning.

25             THE COURT:  Good morning.

4

```
 1                  Anybody else for the plaintiff?

 2                             (No response.)

 3              MS. VARNELL:  Your Honor, I believe Ms. --

 4              THE COURT:  Go ahead, Ms. -- now, we're on the

 5      record, but we can't see you because this is by the phone, so

 6      counsel need to state their name before they speak.

 7      Ms. Varnell, was there anyone else for the plaintiff that you

 8      wanted to put on the record?

 9              MS. VARNELL:  There is, Your Honor.  I believe Tina

10      Wolfson and Chris Stiner are also on the call for the

11      plaintiff.

12              THE COURT:  All right.  Anybody else?

13                             (No response.)

14              THE COURT:  Well, that's certainly enough.

15      Ms. Varnell, I'm going to expect to hear just from you then for

16      the plaintiff.

17                  And for the defendant?

18              MR. KIM:  Good morning, Your Honor.  Raymond Kim for

19      defendant, United Auto Corporation.

20              THE COURT:  All right.  And anybody else with you,

21      Mr. Kim?

22              MR. KIM:  Yes, Your Honor.

23              MR. SABALEWSKI:  Good morning -- good morning, Your

24      Honor.  This is Travis Sabalewski, also for the defendant.

25              THE COURT:  All right, very good.  But, Mr. Kim, I'm
```

5

1   assuming you're the main spokesperson for the defendant; is

2   that correct?

3          MR. KIM:  That's correct, Your Honor.

4          THE COURT:  All right.  What we have here is the

5   defendant's motion to dismiss the plaintiff's second amended

6   complaint, and this is brought under Federal Rule of Civil

7   Procedure 12(b)(6).  I mean, there is one, as I understand it,

8   overriding claim in this case, which is that the defendant is

9   arguing that this particular consumer transaction for the sale

10  of an automobile to an active member of the U.S. military is

11  not covered by the special statute that governs loans to

12  military people, the MLA.

13         I would like, Ms. Varnell, for you to confirm with me

14  my view that if, in fact, the transaction here was not a -- is

15  exempt from the requirements of the MLA, then I believe that

16  that ends the litigation.  Would you agree with that?  In other

17  words, all of the claims that you raise are raised specifically

18  as alleged violations of that statute.

19         MS. VARNELL:  That's entirely true, Your Honor.  Your

20  decision today hinges entirely on whether or not the exemption

21  should be afforded to this defendant where they sold an

22  additional add-on product, a financing product, in addition to

23  the vehicle itself.

24         THE COURT:  All right.  Now, the question that I have

25  for the plaintiff at this point is how can you -- do you have

1  any case law, because we couldn't find any, any case law where

2  the courts have interpreted this type of an argument before,

3  that is, where there is this GAP provision of what I would deem

4  to be basically sort of an insurance policy kind of provision

5  rendering this as a hybrid transaction that would put it

6  outside of the exemption?

7          In other words, is there any case law to your

8  knowledge that has addressed the issue that's before this

9  Court?

10         MS. VARNELL:  I am absolutely certain that there is

11  not, Your Honor.  We are making the law in this case.

12         THE COURT:  Okay.  That was our impression.

13         MS. VARNELL:  I --

14         THE COURT:  Go ahead.

15         MS. VARNELL:  I do wish to inform the Court, though,

16  about a little bit of history because there was a nearly

17  identical case filed against the other largest financier of

18  buy-here/pay-here, the used car dealerships in the country

19  under the MLA.  I filed that case in the Middle District of

20  Florida, and I wish that I could offer you an opinion from that

21  case, but because that case is a little bit more complex and

22  because of the particular actions of the defendant in that case

23  and the National Auto Dealers Association, we should not expect

24  the decision in that case prior to this Court's.

25         I do think it's relevant to your consideration, what

7

1    happened in that case, because that's exactly why we have these

2    waters muddied perhaps from the withdrawal of the guidance that

3    was very clear, I would waive summary judgment in both the

4    Florida case and this case tomorrow in the event that that

5    guidance was still on the books, but the waters were muddied

6    particularly because I sued the largest buy-here, pay-here

7    dealership and finance company in the country for this

8    same-type violation, and within months of filing this, they ran

9    to this administration, the National Auto Dealers Association

10   did, and requested that they withdraw this clear poster child

11   guidance that said if you finance GAPs in addition to this,

12   that's the exact example of a transaction that would not be

13   covered by the extension.

14           And that's really what created the -- sort of muddied

15   the waters for the Court, that it should not muddy the waters

16   for the Court because the prior existing guidance from the

17   Department of Defense and the clear language of the statute and

18   the regulation which has not changed says that this is consumer

19   credit.  The financing of this insurance-related product is

20   consumer credit.

21           And, Your Honor, I would request that the Court, I do

22   believe that it's crystal clear that this is a very simple

23   decision and that's the only serious decision that Your Honor

24   needs to make in determining the motion.  I would ask that the

25   Court let me explain a little bit about why this case is so

8

1   important beyond the fact that it's the first case that will

2   interpret this issue.

3           THE COURT:  Go ahead.

4           MS. VARNELL:  The case is important because only, you

5   know, the law is -- this law is meant to protect those who

6   protect us.  As a veteran myself and a career consumer

7   protection attorney, I could tell you that I understand very

8   well what happens to our military when they get into financial

9   distress, and I want this Court to understand that most --

10  something that most people are not aware of.

11          When a servicemember gets into financial distress,

12  they lose their security clearance.  It happens to over 20,000

13  soldiers each year in this country, and about 80 percent of

14  those are directly due to really bad loans like the one here.

15  It's bad for the soldiers, and it costs our military millions

16  and millions of dollars every year.

17          In this case, Sergeant Jerry Davidson, he's an

18  aviation operations supervisor at the time that he took this

19  loan for the United States Army, and his wife, who is still

20  today an army flight instructor, they were both sold a crappy

21  2011 used car by this defendant, by a defendant dealership that

22  this company -- that this defendant finances.

23          The used car lots are always intentionally co-located

24  with our military bases all over the United States, and these

25  used car lots typically do what we saw here.  They add on other

9

1   products and other amounts in order to create a profit center,

2   and when they do such, they have to comply with the MLA, just

3   like every other finance company, every other credit union has

4   managed to do since passage of the Military Lending Act, and in

5   this case, this crappy used car, the actual calculation of the

6   interest rate was over 26 percent for a 2011 GMC Acadia.

7          So this case is important because this is precisely

8   why the Military Lending Act was passed.  So I'll leave it at

9   that and answer any other questions that Your Honor might have

10  on her mind.

11         THE COURT:  All right.  Well, I want to ask both of

12  you to talk to me a little bit about this GAP, I'm calling it

13  insurance.  Do I understand correctly that it works in the

14  following fashion:  I call it insurance because it looks to me

15  as though that's what it is, that it -- for a fee, it provides

16  that if the vehicle is totaled, because that's the security for

17  the loan, at that point, I am assuming that the loan or what is

18  due on the loan is forgiven.

19         Is that correct, or do I misunderstand how that

20  works?

21         MR. KIM:  Your Honor -- Your Honor, this is Ray Kim

22  for the defendant.  That essentially -- that is essentially

23  accurate.  So just to give you an example, if a borrower

24  finances the vehicle and, let's say, finances $20,000 and then

25  the next day or a year later totals the vehicle or, for

1  instance, such as a vehicle was stolen and it is deemed a total

2  loss but the insurance company will only cover, let's say,

3  $10,000 but the borrower still owes $15,000, the insurance will

4  cover the additional 5,000, so the borrower will owe nothing to

5  the auto finance company.  So it's a form of insurance.

6          So it covers that gap between what is owed to the

7  auto finance company and what the, what the insurance will

8  cover for the loss.

9          THE COURT:  All right.  Now, Ms. Varnell, do you

10  agree that that's how the GAP operates?

11          MS. VARNELL:  I believe that that is the basic

12  premise of GAP, but I think it's very important that this Court

13  understand that a dealership does not have to sell GAP in order

14  for a buyer to have GAP protection.  You can go -- any, any

15  person who has insurance on their car, which everyone is

16  required to maintain, as were the plaintiffs in this case, and

17  buys for 50 or 60 dollars a tiny percentage of your collision

18  amount, you can buy GAP coverage for 50 or 60 bucks on your

19  insurance policy, but instead, these dealerships use this

20  add-on product at, in this case, it was $395, almost $400

21  instead of 50 bucks, and they, you know, they don't have to buy

22  it from the dealerships, but what these dealerships typically

23  do is force it in where they say you need this, it needs to go

24  on here, you need to have this because we sold you a car,

25  obviously, that's going to be in serious negative equity the

1    minute that you drive it off the lot, in fact, it's not going

2    to be worth what they paid for it, obviously, on the day that

3    they bought it.

4            So I think it's important that this Court understand

5    that there's many other ways to have GAP protection other than

6    to be sold it at an exorbitant rate and have it essentially put

7    on the contract automatically as not -- it's not even optional.

8            THE COURT:  Whoa, whoa, whoa.  Why do you say it's

9    not optional?  I thought there was an opportunity to check for

10   it or against it.

11           MS. VARNELL:  Well, you would think that's the case,

12   but what we know and what discovery will immediately reveal is

13   that it's present on every one of the deals that these used car

14   dealers make because this is a profit center for them, and so

15   most consumers are not in the position to understand that this

16   is something that they could get as part of their -- when they

17   go to purchase insurance on their vehicle elsewhere.

18           So it's, it's just -- you know, in this case, I think

19   what you'll see is that GAP is going to be present on virtually

20   every transaction that this, that this defendant finances.

21   It's very important for profit.

22           THE COURT:  All right.  Mr. Kim?

23           MR. KIM:  Your Honor, this is --

24           THE COURT:  Go ahead.

25           MR. KIM:  I'm sorry, Your Honor, this is Ray.  Just

1    to address a couple of points there, I can't speak to how much

2    GAP insurance costs after market in Virginia.  I would be

3    shocked if it's 50 or 60 dollars, but, but I don't think it is

4    50 or 60 dollars.  That's the first point.

5           And second, GAP insurance, it is completely optional.

6    Ms. Varnell is -- I believe it's, you know, it's speculation

7    that these are included in, in every retail installment sale

8    contract from these dealerships.  At the end of the day, you

9    know, the borrowers are walking into the dealerships, and they

10   are working with the dealerships to purchase the vehicle and

11   purchase GAP insurance, and in my experience, it's always been

12   optional, as well as I would be shocked, I think it's something

13   that would -- that Ms. Varnell would have to take up with the

14   dealerships in this instance if that's not the case, but I

15   would be shocked that that is something that's mandated by the

16   dealerships.

17          THE COURT:  Well, it's on the contract, but as I

18   looked at the contract, there's no indication that there has to

19   be -- it has to be accepted by the consumer.  There were some

20   things on that contract which the consumer had not accepted, as

21   I recall.  There were other optional costs that the consumer

22   did not -- there's no little check mark indicating that that

23   had been accepted.

24          All right.  Well, that's one question.

25          MR. KIM:  That's correct, Your Honor.

1          THE COURT:  Yeah.

2          MR. KIM:  It's a blank line item.  It's not even

3   listed on the contract, and it has to actually be inserted into

4   the contract.

5          MS. VARNELL:  It is largely irrelevant to the crystal

6   clear decision that this Court has to make today anyway.  The

7   fact of the matter is the plaintiff was charged for GAP, paid

8   for GAP.  It was part of the finance contract.  It was an

9   additional product over and above the vehicle itself, and it

10  was a financing product.

11         THE COURT:  Yeah, but the question is not quite that

12  simple, it seems to me, given the fact that the instruction

13  was, was there at one point which would, as you correctly said,

14  probably have made this a very simple decision, and then it

15  was, it was withdrawn.

16         Now, whether it was withdrawn for good reasons or bad

17  reasons is really, you know, at this point not before the

18  Court.  The question is whether or not one can characterize

19  this GAP insurance as, as being within the scope of the overall

20  motive for this statute, which is a very good statute.  It's

21  meant to protect a special class of consumers.

22         But would you not agree, Ms. Varnell, that having an

23  insurance that protects the consumer from being on the hook for

24  having to pay on a loan for a car that has -- for which the

25  security has disappeared is actually a protection to some

1   degree?  If the servicemember does not have GAP insurance and

2   if the car were totaled or stolen, then -- and the, and the

3   insurance that was maintained on the vehicle was insufficient

4   to cover the remainder of the, of the loan, then the

5   servicemember is on the hook.

6           So the one --

7           MS. VARNELL:  Well, Your Honor, the basic premise

8   does make sense, but I will assure you, I've been doing

9   consumer protection work for 25 years, and GAP insurance is one

10  of these craft, high, very expensive credit products that

11  consumers should not buy at car dealers.

12          There's, there's an abundant, in fact, there was a

13  fantastic study that came out just this summer, July of 2020,

14  done by the FTC and the CFPB that specifically was looking into

15  all of the extra credit-related products that were put on the

16  consumer transactions, and it is clear when you, when you look

17  at this from the perspective of what the market would properly

18  charge for the protection that's being provided to people,

19  there's much less expensive options and that the car

20  dealerships should not be inserting this GAP insurance at the

21  dealership so regularly.

22          The -- you know, it's a profit center.  There's a

23  number of ways that they can sell it.  They sell it as GAP

24  waivers when they hold their own -- when they hold the

25  financing contracts themselves, and then they sometimes buy the

1    insurance at, you know, literally from anywhere from 10 to 30

2    percent of what the insurance actually costs for that

3    dealership to buy or that consumer.

4         So I do not agree that these are great products.  I

5    think that they're running around wearing a halo wrongly in

6    front of the Department of Defense, saying, oh, we really need

7    to protect soldiers, but that's not the reality of this

8    product.  It is -- if you really looked at the overall

9    structure of the loan and what our soldier got in exchange for

10   a very substantial obligation of more than $21,000, he got sold

11   what we call in the South a pig in a poke.

12        There is -- this is not the kind of transactions that

13   we want to be encouraging, and at a minimum, and you're going

14   to, you know, maybe the government doesn't need to be in the

15   business of regulating whether you get a good deal or a bad

16   deal on a used car, but they darn sure should be in the

17   business of regulating whether or not our soldiers are getting

18   really bad finance charges and these extra add-on products they

19   sell for a substantial percentage of the money that Sergeant

20   Davidson is going to be obligated to pay and is having trouble

21   making the payments on.

22        I'm sure that the defendant could inform the Court

23   that Mr. Davidson was, in fact, behind by a payment at the time

24   that we filed this suit.

25        THE COURT:  All right.  The other charge that's at

1    issue in this case --

2            MR. KIM:  Your Honor?

3            THE COURT:  Yeah, go ahead, Mr. Kim.

4            MR. KIM:  Your Honor, if I may address a couple

5    points there, with respect to the value of GAP, I really think

6    it's, it's subject to, you know, to differing opinions.

7    Whether it's a profit center or not, I think the value of GAP

8    really depends on the down payment that's being made on the

9    vehicle.  So, for instance, in this case, there was a down

10   payment of $2,500, and the amount financed was about $15,000.

11           Now, according to Ms. Varnell, you know, this was a

12   crap car.  Now, if Mr. Davidson drove this crap car off the lot

13   and got into a car accident and it was totaled and the

14   insurance company was only going to offer him 5,000, he would

15   still owe 10,000 on the vehicle, which the GAP insurance would

16   cover for him.

17           So I think in that instance and that example, it

18   would be very valuable to have GAP insurance, and I think the

19   auto industry recognizes that the value of GAP insurance

20   largely depends on the amount of the down payment that's being

21   made, and here, for instance, the down payment was not

22   significant.

23           And I think we also have to separate -- whether

24   there's a bad deal on a vehicle purchased, I believe that's

25   wholly apart from whether there's a violation of the MLA here,

17

1    and the MLA, you know, it prohibits APRs or MAPRs greater than

2    36 percent.  Here I think it's clear that the MAPR was 22.99

3    percent.

4            We're not here to really discuss, you know, whether

5    it's a good deal or a bad deal, but at the end of the day, Your

6    Honor, again, my client's position is that there was no

7    violation of the MLA.

8            THE COURT:  All right.  Now, there was also a

9    processing fee that was added onto the total that was financed

10   here.  What is the processing fee used for?  I don't think that

11   appears in the papers.

12           Mr. Kim, do you know?

13           MR. KIM:  I believe it's, it's like a document

14   processing fee, Your Honor, that I believe just generally are

15   applied when there's a vehicle purchased.

16           THE COURT:  And when you say "document processing,"

17   this would be the car registration, the application for the

18   license plate, that sort of thing?

19           MR. KIM:  Yes, all of that, Your Honor.  And then

20   that's paid to the, to the dealership.

21           THE COURT:  All right.  Now, that's, I believe,

22   though, one of the additional charges about which the plaintiff

23   is claiming violates the -- or am I wrong about that,

24   Ms. Varnell?

25           MS. VARNELL:  Actually, Your Honor, I think that we

1   need to do just a tidbit of discovery to determine what this

2   actually means.  As Your Honor has correctly noted, it's two

3   words on a piece of paper.  Do we know whether or not that is

4   actually directly related to the vehicle itself, was it

5   necessary, or is it just simply an add-on fee?

6          I don't know what the nature of that fee was -- is

7   really about until we do a little bit of discovery, and neither

8   does the Court or the defendant today, so I think that that

9   can't be determined prior to discovery on the nature of the

10  charge.

11         THE COURT:  All right.

12         MS. VARNELL:  And therefore, the component --

13         THE COURT:  All right.  Now, the other issue that you

14  both sort of dispute is the actual MPAR (sic) in this case.

15  The defendant submitted an amortization chart and requested

16  that the Court take judicial notice of it, and I did not sit

17  down and I don't intend to sit down with a calculator and try

18  to work this all out, but I will tell you that it appeared to

19  the Court that this made reasonable sense, and I don't think it

20  converts this motion to dismiss to a motion for summary

21  judgment, because what the defendant has simply done is taken

22  the numbers that are in the contract, and the contract clearly

23  is appropriate to be considered because it's inherently the

24  essence of the whole complaint, it lists the amount that was

25  totally -- the total amount that was financed.  It lists the --

19

1    and it lists the monthly payment that results from that amount

2    and from the interest rate that is quoted, and then they simply

3    did the mathematics.

4         So I want to know as an officer of the Court,

5    Ms. Varnell, do you disagree with the numbers that are

6    generated if you take those simple numbers and put them over

7    the 42 months that this contract was for?

8         MS. VARNELL:  I do, Your Honor, and please permit me

9    to explain how I arrived at the number that I did.

10        THE COURT:  Okay.

11        MS. VARNELL:  So when, when I -- because I'm one of

12   the first consumer lawyers who's brought these private actions

13   of this nature, I sought out to determine, okay, how are the

14   credit unions who are financing military servicemembers, what

15   are they using to calculate the MAPR?  To what are their banks

16   that are doing this -- who are the people that are doing this

17   right, and what method do they use to determine what the

18   appropriate APR should be listed and what disclosures must be

19   on a contract with an active duty military?

20        And I went to the Credit Union National Association

21   website and read a bunch of their guidance, and what I learned

22   is that the Credit Union National Association hired a

23   particular gentleman to create an MAPR calculator because, you

24   know, the dealerships that are utilizing this and the credit

25   unions all need to know this is exactly something that we can

1    rely upon for properly computing this in compliance with the

2    regulations, and I sought out and hired and put on retainer

3    that particular expert, who created the Credit Union National

4    Association's calculator, and it was very inexpensive, and I

5    learned from him exactly what went into his, the calculations,

6    and then I had him run any transactions from any contracts that

7    I was reviewing through the MAPR calculator, and that was where

8    we came up with the alternative, and the appropriately stated

9    MAPR was from that particular expert on which the overwhelming

10   majority of all credit unions in the United States that are

11   making Military Lending Act loans on cars are using.

12         So --

13         THE COURT:  But that doesn't -- I'm sorry, that

14   doesn't explain to me what -- where is the difference between

15   how he is calculating the interest rate, the effective interest

16   rate, and the way the defendant is doing it?  Because it seems

17   to me we're dealing with a fairly -- we're a closed-end

18   transaction.  This is a case where the interest rate is set,

19   the number of -- the number of months over which the loan

20   applies, that is a set number.  It's 42 months, right?  There's

21   no dispute about that.  It's clear as to when the first payment

22   is due.

23         As I recall how the defendant explained the

24   calculation, they take the interest rate, and they sort of

25   divided what the effective daily rate would be, and so that

1    that first month's payment is a little bit different because of

2    the length of time between the time the contract is signed and

3    the time -- the due date for the first payment.

4            So I don't quite understand where the difference lies

5    between the two approaches.

6            MS. VARNELL:  So it's about what category, what block

7    you put the extra charges on, for instance, the, the GAP

8    insurance, which should be included within the financing cost,

9    as opposed to where it's currently being included.

10           And things like, for instance, the MAPR calculator

11   was where we determined that there was prepaid interest,

12   despite the fact that it doesn't appear on the contract, and

13   the expert explains to me that this always happens where you

14   have the time gap between the first payment and the -- and a

15   date here, the transaction took place on the 13th of October,

16   later.

17           So, Your Honor, ultimately you have a factual dispute

18   here, and in the end, you'll see in my complaint that we

19   clearly state that regardless of what the rate that was stated

20   here, it was not presented in the way that a military MAPR has

21   to be communicated to our servicemembers.  There are very

22   special requirements of how an MAPR is to be communicated to

23   active duty military, and it is not simply provided in the

24   truth in lending box of this nature.  You have to give this

25   separate disclosure, and that's fully stated in the complaint.

22

1          We believe that the fact that there was not a single

2   disclosure made here just makes it clear that they don't

3   believe the MA -- Military Lending Act really applies.  I don't

4   really think that's in dispute.  Mr. Kim won't dispute that.

5          This transaction was not made in any way, shape, or

6   form in compliance with the MLA.  They're not purporting to say

7   that it does.  They didn't give Military Lending Act

8   disclosures.

9          Regardless of what the amounts are, they did not give

10  the disclosures that are required under the MLA.  It actually

11  has the words in it, it tells the person where they can call,

12  or it gives them in a written form that explains this is what

13  your MAPR business is, this is what your finance charge

14  actually is, and so they can't wear the clock of compliance

15  because -- merely because they put the TILA disclosures in a

16  truth in lending form.

17          THE COURT:  Okay.

18          MS. VARNELL:  I mean, if this Court determines that

19  the Military Lending Act does apply because it was an extra

20  add-on finance product, then if you ask Mr. Kim now, I believe

21  that he will tell you as an officer of the Court that this

22  transaction was not done in compliance with the MLA because

23  they did not believe that it applied.

24          THE COURT:  All right.  Mr. Kim, that's a good

25  question.  Do you want to respond to that?

23

1            MR. KIM:  Yes, Your Honor.  Well, I think, I think

2    the issues there were somewhat conflated.  I think the question

3    of whether the MAPR is accurate, I don't think there really can

4    be a dispute there.

5            The MAPR is slightly different from the APR under

6    TILA because an MAPR is supposed to include, for instance,

7    credit insurance products such as GAP, and here when we look at

8    the contract on page 2, it's undeniable that the total amount

9    financed, the $14,698.24, includes the $395 for GAP and

10   includes the $250 for the processing fee.  And so again, you

11   know, it's just, it's just a matter of performing the

12   mathematical calculation.

13           And as Your Honor recognized in our motion on pages

14   13 and 14 and in our amortization table, the math just makes

15   sense that when you take the total amount financed, which again

16   includes GAP insurance and the $250 processing fee, over 42

17   months based on the, the annual monthly payment, the amount is

18   correct.

19           And again, it's just indisputable that those costs

20   are in the total amount financed, and so, you know, if this

21   expert believes otherwise, you know, I believe that plaintiff

22   would have submitted something in the opposition brief to

23   dispute the math, but again, nothing was provided, and so with

24   respect to the MAPR, again, the 22.99 percent is accurate.

25           Now, I think there's a separate issue that

1   Ms. Varnell raised of whether there were MLA disclosures

2   provided.  Under the, under the MLA, it does require that

3   certain disclosures be provided, for instance, that, that the

4   MAPR would not exceed 36 percent.  At this point, we have not

5   challenged that issue in the -- in our 12(b)(6) motion, but

6   that's a second, Your Honor, that's a different claim.

7           And so again, our position is that the MLA does not

8   apply here.

9           THE COURT:  Well, that's -- as I said at the very

10  beginning, that's the overriding issue, whether the ML -- but

11  that is the question that Ms. Varnell did posit, and I'll

12  repeat it to you, and that is, do you agree that if you are

13  covered by the MLA, that your -- the contract that's before us

14  in this case would not be in full compliance?

15          MR. KIM:  I do, Your Honor, yes.

16          THE COURT:  Okay.  All right.  And to some degree,

17  that makes it easy for the Court because it's a crystal clear

18  issue that really wraps the whole case up.

19          Then do you want to add anything further to what

20  either has been argued today or to the briefs as to why your --

21  the contract at issue here is exempt?  I mean, do you have

22  any --

23          MR. KIM:  Yes, Your Honor.

24          THE COURT:  Let me ask you this first:  Do you have

25  any case law?  Because again, we could not find any that

1   supported the plaintiff's position, but also, we couldn't find

2   any that would support your view.

3            Now, I recognize that the withdrawal of the 2017

4   instruction is somewhat recent, but are you involved, Mr. Kim,

5   in the Florida litigation that was referenced by Ms. Varnell?

6            MR. KIM:  I am not, Your Honor.

7            THE COURT:  All right.  But I assume you're aware of

8   it?

9            MR. KIM:  I was not aware of that lawsuit.

10           THE COURT:  Oh, all right.  Okay.

11           So anyway, are you aware of any litigation or of any

12   case law that addresses this issue?

13           MR. KIM:  I'm not, Your Honor.  Aside from that one

14   case that we cited in Maryland regarding the arbitration issue,

15   nothing specifically on this particular issue of whether the

16   MLA would apply to an auto finance transaction, and my, my

17   belief is that it's not out there because the statutory

18   language and the regulatory language of the definition of

19   "consumer credit transaction" is just, is just clear, and it's

20   plain language, it would be (inaudible).

21           And so, Your Honor, if I, if I may, because I feel

22   like it's really important to this discussion to make the

23   distinction between the auto finance exception, which is found

24   in the regulation under 32 C.F.R. 232.3(f)(2)(ii), and the

25   personal property exception, which is found under (f)(2)(iii),

1   and I believe that plaintiff is arguing that this auto finance

2   transaction would be subject to the MLA based on the DoD's

3   interpretation of (f)(2)(iii), the personal property exception.

4          I believe that's just incorrect.  And if the Court

5   would like, I could -- I can explain our position on that.

6          THE COURT:  Go ahead.

7          MR. KIM:  Okay.  So I think what I should do, perhaps

8   I can start with a little bit of history.  Again, as the Court

9   is probably aware, the MLA was originally enacted to protect

10  active military members from certain predatory lending products

11  such as closed-end payday loans and closed-end auto title loans

12  and tax refund anticipation loans, those types of products.

13         In 2015, the DoD expanded the definition of "consumer

14  credit" to include other credit transactions like unsecured

15  open-ended credit lines and credit cards, for instance, and as

16  a result -- at that time, the definition of "consumer credit"

17  always and consistently excluded auto finance transactions

18  where the vehicle was secured -- I'm sorry, where the loan was

19  secured by the vehicle.  That has never changed.

20         And not only the statutory definition but in the

21  MLA's regulatory definition, consumer credit transaction always

22  excluded again any credit transaction that's, quote, expressly

23  intended to finance the purchase of a motor vehicle when the

24  credit is secured by the vehicle being purchased, which is

25  exactly the case here with the plaintiff's auto finance

1   transaction.

2          So this, so this auto finance exception, I'll refer

3   to it as the auto finance exception, that's found in again

4   (f)(2)(ii) of the regulations.  Again, I think this is

5   important because I believe plaintiff's attempts to kind of

6   conflate the two, the auto finance exception with its other

7   exception found under (f)(2)(iii), which is the personal

8   property exception.

9          And so following the, the DoD's kind of expansion of

10  consumer credit transaction 2015, there were a number of

11  questions that were raised, and so the DoD addressed those

12  questions in a ruling that it issued in August of 2016, and I'm

13  going to refer to this as the August 2016 ruling.  And so among

14  other questions, there was question No. 2, which asks whether

15  credit that a creditor extends for the purpose of purchasing

16  personal property which secures credit, whether that falls

17  within the exception of consumer credit under (f)(2)(iii),

18  where the creditor, quote, simultaneously extends credit in an

19  amount greater than the purchase price.

20         Ultimately, the question was if somebody is -- if

21  someone is receiving credit to purchase personal property but

22  in addition they are going to receive a cash advance loan,

23  which is what the DoD referred to it as, then no, that

24  personal -- the personal property exception would not apply to

25  that transaction.

1          So essentially, the DoD said it's, it's a hybrid

2    purchase money and cash advance loan, and it's not expressly

3    intended to finance the purchase of personal property only, and

4    as a result, it's going to be subject to the MLA.

5          So I guess the example I could give is somebody is

6    going to go buy an appliance and they're going to receive

7    financing to go buy a new refrigerator for $2,500, but in

8    addition, they receive a cash advance loan of $1,000 completely

9    unrelated to the purchase of that refrigerator.  The DoD

10   explained that while that personal property purchase is going

11   to be subject to the MLA under the cash advance loan there,

12   that's, you know, in theory unsecured and has nothing to do

13   with the purchase of the refrigerator.

14         Now, as a result -- and again, that August 2016

15   ruling only dealt with that (f)(2)(iii) and the personal

16   property exception.  Then what happened was because of that

17   August 2016 ruling, there were additional questions that were

18   raised which the DoD then decided to address in a, in a

19   separate ruling issued in December of 2017.  Now, this December

20   2017 ruling addressed the auto finance exception under

21   (f)(2)(iii).

22         And so I'm just going to quote the question, and this

23   is from the December 2017 ruling, and this goes to question 2

24   of the August 2016 ruling.  So, "Does credit that a creditor

25   extends for the purpose of purchasing a motor vehicle or

1    personal property, which secures the credit, fall within the

2    exception to 'consumer credit' under 32 C.F.R. 232(f)(2)(ii) or

3    (iii) where the creditor simultaneously extends credit in an

4    amount greater than the purchase price of the motor vehicle or

5    personal property?"

6              So with this question, the DoD responded, well, it

7    depends, all right?  And what the DoD explained was it

8    distinguished between credit that finances the purchase of the

9    vehicle itself and additional costs that are, quote, expressly

10   related to the, to the vehicle or object, such as leather

11   seats, versus financing the purchase of the vehicle and

12   credit-related products, such as GAP insurance.

13             All right.  And so what the DoD said was, well, if

14   it's leather seats, then that's -- essentially the nexus to the

15   actual vehicle is so strong that it is still excluded from the

16   MLA because it falls within the auto finance exception.

17   However, if the financing offers a related product such as GAP

18   insurance, then it does not fall within the MLA's exception

19   because GAP insurance, what the DoD kind of explained was it's

20   just, the nexus isn't, isn't close enough to the vehicle

21   purchase.

22             Now, what happened as a result of that December 2017

23   ruling was that -- I think we kind of touched on this

24   earlier -- a number of organizations and institutions in the

25   auto finance industry went to the DoD and explained that this

1  is causing confusion, it will create compliance issues with the

2  auto finance companies, technical compliance issues, and also

3  it will prevent auto finance companies or dealerships from

4  offering GAP insurance to active military members, and that is

5  inconsistent with what the MLA is trying to do, which is

6  protect active military members.

7         And this was, this was a slew of organizations and

8  trade associations that, you know, as Ms. Varnell mentioned,

9  NADA, National Automobile Dealers Association; the ABA,

10  American Bankers Association; National Independent Automobile

11  Dealers Association; there are a number of others.

12        And ultimately, it was because of this concern that

13  was raised that in February of 2020, the DoD expressly withdrew

14  the December 2017 ruling, and in so doing, it reverted back to

15  the August 2016 interpretive rule, and what's really important

16  there is that again the August 2016 rule only applies to the

17  personal property exception, not the auto finance exception,

18  and so that kind of brings us full circle back to this case

19  because here plaintiff is claiming that his contract which is

20  for auto finance and included GAP insurance is not covered by

21  the auto finance exception, but that can't be the case because

22  the auto finance exception under (f)(2)(ii), it just -- again,

23  the plain language of the statute and (f)(2)(ii) under the

24  regulation both exclude auto finance transactions.

25        And so plaintiff's reliance on the August 2016 ruling

31

1    is just, it wouldn't make sense because if the August 2016

2    ruling was to apply here, then the DoD never would have come

3    out with the December 2017 ruling discussing specifically the

4    auto finance exception, and then in February of 2020, the DoD

5    would not have had to withdraw it because the August 2016

6    ruling would have expressly covered it, and for that reason, in

7    the February 2020 ruling, the DoD made it clear that auto

8    finance transactions like plaintiff's here aren't subject to

9    the MLA.

10          THE COURT:  All right.

11          MR. KIM:  And also, Your Honor, the MLA statutory

12   definition again, it's -- just the plain language shows that if

13   an auto finance transaction where the vehicle secures the loan

14   or the contract, it's just not included.  That was never the

15   intention of the legislators and never the intention of the

16   DoD, I believe, when it passed these regulations.

17          And lastly, I would say that if the Court does

18   believe that the DoD's interpretation of this regulation covers

19   auto finance transactions, I would argue that the statutory

20   definition of "consumer credit," which expressly excludes auto

21   finance transaction, as a matter of law trumps the DoD

22   interpretation of the regulation because it's, because it's

23   just, it's legislation, and legislation here would trump the

24   DoD's interpretation of the regulation just based on the cases

25   that have been cited in my client's reply brief.

1    THE COURT:  All right.  Ms. Varnell, you mentioned

2  that credit unions use contracts for financing automobile sales

3  that do in your view comply with the MLA; is that correct?

4    MS. VARNELL:  Yes, Your Honor.

5    THE COURT:  Do those contracts include -- offer GAP

6  insurance?

7    MS. VARNELL:  If they do offer GAP insurance, the

8  amount of that credit insurance would be included within the

9  APR and the finance charge, and the military consumer would be

10  given different disclosures than what were provided to the

11  consumer here.  So --

12    THE COURT:  Well, wait a minute, though.  What kind

13  of disclosures are you -- because that's -- I don't believe

14  that that's in the complaint.  What are the disclosure defects

15  that you think are at issue here?

16    MS. VARNELL:  So the Military Lending Act is there,

17  there have been, like, literally they printed out examples

18  as -- the Department of Defense provided actual examples.  You

19  say to the person, you know, this is a loan that is governed, a

20  transaction that is governed by the Military Lending Act.  This

21  is your actual military lending annual percentage rate, the

22  MAPR.  This is your actual finance charge.  And it includes all

23  those additional costs that would pass onto the law.

24    And then it also provides frequently the -- if they

25  are not going to give them the actual fully written set of

33

1   disclosures like that, it provides a 1-800 number where the

2   consumer can call and get their rights under the Military

3   Lending Act disclosed to them.

4           So importantly, if this is governed by the Military

5   Lending Act, Congress said we are not -- you are, you are

6   protected from onerous provisions like disclosure of damages --

7   not disclosure, I'm sorry -- waiver of certain categories of

8   damages, arbitration, and other onerous provisions like that.

9   And so the consumer -- a military consumer is entitled to know

10  what their rights are under the Military Lending Act, and none

11  of that was given to the consumer in this case.

12          THE COURT:  All right.

13          MS. VARNELL:  That's why it brings us right back to

14  this critical distinction:  Does -- are they entitled to the

15  exemption or not?

16          And I don't -- I could tell you're very informed on

17  this issue, and I'm delighted that you understand that it is

18  so -- it really is so dependent upon that threshold issue, and

19  so I would just alert the Court that the plaintiff's briefing

20  on pages 9 and 10 in particular respond directly to the

21  argument that Mr. Kim just advanced, and at the heart of our

22  response to all of this, the regulation did not change.

23          And nothing about what this complaint requests the

24  Court to do acts to contradict the plain language of the

25  statute because here's the thing:  This was not a transaction

1    just to sell a used car.  It was a used car along with a credit

2    insurance product, GAP.  We can debate all day over the value

3    of GAP and whether you should buy it from your insurance

4    company or whether you should buy it at five times the price at

5    the car dealership, but that's not what is before the Court

6    today.  It also finances other costs such as the processing

7    fee.

8             But nobody, what you did not hear Mr. Kim say to you

9    today is that anything about this transaction was -- involved

10   appropriate disclosures under the Military Lending Act because

11   the defendant does not believe that the MLA applies to the

12   loan.

13            THE COURT:  Okay.

14            MS. VARNELL:  And this Court will just have to decide

15   whether the plaintiff is correct or the defendant is correct in

16   that when you add in other products, whether or not that was

17   just another attempt to evade MLA, you know, to sneak in under

18   the cloak of a, a compliance transaction and -- or to cloak it

19   into a regular transaction that involves just the sale of a

20   car, or whether indeed it is exactly what the Department of

21   Defense was trying to fix in 2016.

22            If you go back and read the Code of Federal

23   Regulations, it's clear that in 2015, they said we have way too

24   many loopholes, and we've seen all of these unscrupulous

25   lenders trying to add on all of these extra charges and fees to

1   these transactions.  We have to find a way to close the

2   loopholes because that's why there is no litigation under the

3   Military Lending Act.

4           So they attempted to do it by dramatically expanding

5   the definition of what, what it applies to, and they said that

6   consumer credit involved anytime that they're financing more

7   than four payments, any product essentially, anything that you

8   would -- that would fall under Reg Z, under the Truth in

9   Lending Act, and I submit to the Court that it is undeniable

10  that there is GAP sold within the financing product on this

11  transaction and that that product, GAP, fairly pulled this

12  transaction under the definition of consumer credit.

13          And the last thing I would say in closing, but it is

14  reiterated on pages 9 and 10, is that the Department of Defense

15  clearly said when it did withdraw the 2017 question-and-answer

16  guidance, it said in withdrawing this amended question and

17  answer, the Department is reverting back to the original

18  question and answer published in 2016, and it clarified it is

19  not changing any interpretation, and it sure as heck did not

20  change any regulation that was in existence, and the regulation

21  says that GAP was credit, it is a -- it is consumer credit, it

22  is financed, a product that was financed.

23          THE COURT:  All right.  Well, thank you, counsel.

24  It's been a very interesting argument.  Obviously, since this

25  will be a case of first impression, I want to make sure we've

36

1  done the issues justice, so it will take a little time to get

2  an opinion out.

3         In the meantime, I can't recall whether -- has the

4  defendant filed an answer yet in this case?  Probably not,

5  right, because you just filed the motion to dismiss?

6         MS. VARNELL:  No, Your Honor.

7         MR. KIM:  That's right, Your Honor.

8         THE COURT:  All right.  Obviously, any, any timing

9  for an answer is going to be delayed until you get a ruling on

10 this motion.  I'm assuming we have not issued a scheduling

11 order.  I don't think we have in this case.  No.  So there's

12 nothing else you-all need to do.

13        Obviously, if anything changes in terms of the, the

14 litigation world, if for some reason an opinion comes out of

15 the Florida court before we issue ours, that would obviously

16 potentially be relevant to this case, I would expect you-all to

17 advise us of any change in the law, but other than that, we

18 will try to get an opinion out as soon as possible.

19        But thank you, and you-all stay safe.  Bye-bye.

20        MS. VARNELL:  Thank you, Your Honor.

21        MR. KIM:  Thank you, Your Honor.

22                      (Which were all the proceedings

23                       had at this time.)

24

25

37

1                    CERTIFICATE OF THE REPORTER

2         I certify that the foregoing is a correct transcript of

3    the record of proceedings in the above-entitled matter.

4

5

6                                        /s/
                                 _____
                                 Anneliese J. Thomson
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25